**Dr. Jack BURTON et al., Appellants,**

v.

**Dr. N. Jay ROGERS, Appellee.**

No. 7448.

Court of Civil Appeals of Texas, Beaumont.

March 15, 1973.

Motion for Rehearing Overruled April 4, 1973.

Jack Sparks, Asst. Atty. Gen., Austin, for appellants.

Mehaffey, Weber, Keith & Gonsoulin, Beaumont, for appellee.

KEITH, Justice.

Defendants below appeal from an order overruling their pleas of privilege to be sued in Travis County. The defendants are the five individuals who, along with the plaintiff, constitute the Texas Optometry Board created under the provisions of Art. 4552–2.01, Vernon's Ann.Civ.St. (Supp.1972).[1] Plaintiff sought a declaration that a specific interpretation of § 5.09 of the Act adopted by defendants was null and void because: (a) it was violative of the provisions of § 2.14 of the Act; (b) the interpretation was ultra vires the power of said Board; (c) that it was null and void as to certain specific items of advertising and those of a similar nature. Plaintiff also sought an injunction to restrain the defendants and their agents from enforcing the interpretation proclaimed by the defendants.

We note that each of the individual defendants resides in some county in Texas other than Jefferson or Travis Counties, but the amended plea of privilege of defendants alleged that each was a member of said Optometry Board and was acting within the scope and course of his duties as a member of said Board in the promulgation of said interpretation; hence, it was asserted that "as members of the Texas Optometry Board, [they] have their legal domicile or residence in Travis County, Texas."[2] Further, according to the

---

1. There was a comprehensive revision of the law regulating the practice of optometry through the adoption of the Texas Optometry Act by the 61st Legislature in 1969. Acts 1969, 61st Leg., p. 1298, ch. 401. Further references to the amendatory Act will be to the sections thereof as they appear in Vernon's Annotated Civil Statutes.

2. This was in essence a plea in abatement which, if sustained, would have required a dismissal of the action, not its transfer to another county. W. D. Haden Company

amended plea, the plaintiff's petition "shows on its face that a Writ of Injunction is sought by Plaintiff against officials of the State of Texas and an agency of the State of Texas and, as such, is only properly maintainable in Travis County, Texas, the seat of State Government for the State of Texas."

Plaintiff filed his controverting affidavit invoking the provisions of subdivision 9, Art. 1995, V.A.C.S. Only the plaintiff testified upon the hearing, at the conclusion of which the court overruled said pleas, and this appeal has been duly perfected after defendants filed their appeal bond.[3]

■ We will discuss together the first two points of error brought forward by the defendants, such points being set out in the margin.[4] In urging these points, defendants misconstrue the allegations of the pleading and the long line of respectable authority which has determined that the acts of state officials not lawfully authorized or which exceed their delegated authority are not the acts of the State of Texas. Such unlawful and ultra vires acts are not entitled to protection under the doctrine of sovereign immunity. The rule was forcefully applied by the United States Supreme Court in United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882), a case involving the title to General Robert E. Lee's property then occupied by Arlington National Cemetery. We cite only a few of the authoritative decisions by our own courts which follow the rule so announced in *Lee*. See: Terrell v. Middleton, 187 S.W. 367 [Tex.Civ.App., San Antonio, 1916, error ref., 108 Tex: 14, 191 S.W. 1138 (1917)]; Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709 (1945);

State v. Epperson, 121 Tex. 80, 42 S.W.2d 228 (1931); W. D. Haden Company v. Dodgen, supra (308 S.W.2d 838); State v. Lain, 162 Tex. 549, 349 S.W.2d 579 (1961); Griffin v. Hawn, 161 Tex. 422, 341 S.W.2d 151 (1960); Texas Highway Com'n v. Texas Ass'n of Steel Imp., Inc., 372 S.W.2d 525 (Tex.1963). Indeed, in a venue appeal Chief Justice Nye of the Corpus Christi Court faced a similar contention advanced by the Attorney General and followed this respectable line of authority. Sanders v. State Department of Public Welfare, 472 S.W.2d 179, 183 (Tex.Civ. App., Corpus Christi, 1971, error dism.).

As plaintiff conceded upon oral submission of the cause, if his suit is against the State or its officials acting within the scope of their authority, he has no cause of action since the suit would be against the State and no permission to sue had been obtained. This concession is required under a long line of decisions, many of which are mentioned in Department of Pub. Safety v. Great S.W. Warehouses, 352 S.W.2d 493, 494 (Tex.Civ.App., Austin, 1961, error ref. n. r. e.).

This brings us to a consideration of the basic issue involved in the case—was plaintiff's suit one against the state officials acting within the scope of their lawful authority? Or, conversely, were acts of the individual defendants complained of ultra vires and in contravention of the lawful authority granted by the statute? Upon submission of the cause, the Assistant Attorney General contended that this issue could only be reached upon the trial upon the merits and could not be considered upon the venue appeal. We disagree, and

v. Dodgen, 158 Tex. 74, 308 S.W.2d 838 (1958).

3. Had defendants below been sued in their official capacity, they would not have been required to give bond on appeal. Art. 2276, V.A.C.S.; Herring v. Houston Nat. Exch. Bank, 113 Tex. 264, 253 S.W. 813, 816 (1923); Wilson v. Thompson, 162 Tex. 390, 348 S.W.2d 17, 18 (1961).

4. *No. 1*: "Plaintiff has shown no cause of action against the Texas Optometry Board since he failed to allege or prove that he had legislative consent to sue a state agency." *No. 2*: "Plaintiff's alleged cause of action is to enjoin the enforcement of the Texas Optometry Act by the Texas Optometry Board and under the provisions of Article 4656, V.C.S. [V.A.C.S.], defendants' plea of privilege must be sustained."

proceed to a determination of the questions presented by the record before us.

On January 27, 1972, the Chairman of the Board addressed a letter to several optometrists, including plaintiff and several licensed optometrists employed by him, advising that the Board had adopted an interpretation of the Act which read as follows:

"It is the interpretation of this Board that the Texas Legislature by the enactment of Section 5.09 of the Texas Optometry Law prohibits price advertising by an optometrist whether it be specific or fixed prices or by phrase or slogan such as 'economical price', 'one low price', 'popular price' *or any other terms or phrases making reference to price.*" [5]

In an opinion dated December 29, 1971, the Attorney General upheld the validity of the "interpretation" previously quoted. *Opinion No. M–1029.* Defendants now contend that, as a matter of law, the action of the Board members in attempting to enforce such "interpretation" was lawful and that neither the trial court nor this court is at liberty to reexamine the question. We have not been referred to any decision which supports this position.

■ Chief Justice Cureton in Jones v. Williams, 121 Tex. 94, 45 S.W.2d 130, 131, 79 A.L.R. 983 (1931), laid down the rule applicable to this case in this language:

"[W]hen a controversy finally reaches the courts for determination, the opinions of the Attorney Generals, rendered in due course, while entitled to careful consideration by the courts, and quite generally regarded as highly persuasive, are not binding on the judiciary, and it is our duty now to enter upon an independent inquiry as to the validity of the act before us."

In Royalty v. Nicholson, 411 S.W.2d 565, 572 (Tex.Civ.App., Houston, 1967, error ref. n. r. e.), it was said: "We recognize that Attorney General's opinions are not in any manner controlling, but they are entitled to great weight unless clearly wrong." In considering the question before us we will follow the rules set out in the cited cases.

■ The only provision of the Optometry Act regulating price advertising of optometrists is § 5.09(a), reading:

"No optometrist shall publish or display, or knowingly cause or permit to be published or displayed by newspaper, radio, television, window display, poster, sign, billboard, or any other advertising media, any statement or advertisement of any price offered or charged by him for any ophthalmic services or materials, or any statement or advertisement concerning ophthalmic lenses, frames, eyeglasses, spectacles, or parts thereof which is fraudulent, deceitful, misleading, or which in any manner whatsoever tends to create a misleading impression, including statements or advertisements of bait, discount, premiums, gifts, or any statements or advertisements of a similar nature, import, or meaning." [6]

The Optometry Act of 1969 repealed the prior acts regulating the practice of optometry [Ch. 10, Title 71, Rev.Civ.Stat. (1925), as amended, and Ch. 5, Title 12, Penal Code (1925), as amended]. Sec. 6.03. One of these repealed statutes, Art. 4556, had authorized the Board to "make such rules and regulations not inconsistent with this law as may be necessary for the performance of its duties, *the regulation of*

---

5. All emphasis herein has been supplied unless otherwise indicated.

6. Sec. 5.10(b) of the Act, regulating price advertising of opticians, forbids, inter alia, "statement or advertisement of *or refer-* *ence to* the price or prices of any eyeglasses, [etc.].*" Plaintiff has called to our attention the obvious fact that § 5.09 (a), supra, governing optometrists, does not contain the prohibition of "reference to" the price, etc.

*the practice of optometry* and the enforcement of this Act." The validity of rules regulating the practice had been upheld by our Supreme Court in several cases, e. g., Kee v. Baber, 157 Tex. 387, 303 S.W.2d 376 (1957); Texas State Board of Examiners in Optometry v. Carp, 412 S.W.2d 307 (Tex.1967).

The amendatory Act now under consideration drastically curtailed the rule-making authority of the Board. Sec. 2.14 of the Act reads:

"The board shall promulgate procedural rules and regulations *only*, consistent with the provisions of this Act, *to govern the conduct of its business and proceedings.* Notwithstanding any other provision of this Act, the board shall not have any power or authority to amend or enlarge upon any provision of this Act by rule or regulation or by rule or regulation to change the meaning in any manner whatsoever of any provision of this Act or to promulgate any rule or regulation which is in any way contrary to the underlying and fundamental purposes of this Act or to make any rule or regulation which is unreasonable, arbitrary, capricious, illegal, or unnecessary."

While the amendatory Act was before the Senate and prior to its adoption, Senator Kennard, Chairman, Public Health Committee then considering the bill, requested an opinion from the Attorney General as to the effect of the proposed § 2.14, quoted above, called attention to the cases of *Kee* and *Carp*, supra, and propounded this question:

"Does Section 2.14 of the proposed bill limit the Board to the making of procedural rules only or would the underlined provisions have the effect of clothing the Board with authority to make interpretive rules or rules which would have the effect of enlarging upon or expanding the specific provisions of the Bill." [7]

The Attorney General answered the question by an opinion dated April 29, 1969 (Opinion No. M–387), quoted copiously from the opinions of the Supreme Court in *Kee* and *Carp*, supra, and advised the Senate Committee as follows:

"In view of the wording of Section 2.14 of Article II of Senate Bill 781, it is our opinion that the proposed bill would limit the Board's rule making power to procedural rules and regulations to govern the conduct of the Board's business and proceedings, and the Board would no longer have the *existing power* to adopt rules and regulations for the enforcement of the provisions of the Optometry Act, nor would the Board possess rule-making power for the regulation of the practice of optometry."

Thereafter, the bill was adopted by the Senate, by a unanimous vote, on May 13, 1969, effective September 1, 1969. Acts 1969, 61st Leg., p. 1298, ch. 401, at 1316.

*Opinion M–1029,* relied upon by the Board in this instance, does not even mention § 2.14 of the Act, nor does it refer to or cite the *Carp Case* or the earlier opinion (*No. M–387*) to the Senate Committee. Instead, citing Shannon v. Rogers, 159 Tex. 29, 314 S.W.2d 810, 815–816 (1958), and some out-of-state cases (many of which were cited in *Kee*, supra), it concluded that the Board's interpretation in issue here was a valid exercise of rule-making powers conferred upon the Board by § 5.09 of the Act.

We have difficulty following the reasoning of the later opinion since, in *Shannon,* the Court was considering the validity and meaning of an act of the *Legislature.* There was no question of rule-making power of the Board involved and the act there under consideration is vastly different from § 5.09 of the Act we have before us.

---

7. The italicized provisions mentioned in Senator Kennard's request began with the words "or by rule or regulation change the meaning" through the remainder of the section.

The Legislature, in unmistakably clear language, changed the rule-making power of the Board when it revised the Optometry Act. The substance of the specific rules upheld in the *Kee* and *Carp Cases,* supra, was incorporated into the new Act [8] and it reserved unto the Legislature the right to enlarge the regulation of the practice of optometry. Thus, the supporting foundation of *Kee* and *Carp* was removed and the Attorney General was correct in so holding in his first opinion, *No. M–387.* It follows, therefore, that if the "interpretation" involved here is anything other than one "to govern the conduct of its [Board's] business and proceedings," it is invalid notwithstanding the later opinion (*No. M–1029*) relied upon by the defendants.

Even a cursory reading of the "interpretation" in issue shows that its purpose has no connection with the conduct of the Board's "business and proceedings," the only rule-making authority conferred by the Act. It is an attempt on the part of the Board to "amend or enlarge" upon another provision of the Act, namely § 5.-09(a), by prohibiting any *reference* to price in the advertising of an optometrist. A dispensing optician, governed by § 5.-10(b), cannot make "reference to the price" of eyeglasses, but that is a specific legislative prohibition which is inapplicable to optometrists. Clearly, the promulgated "interpretation" is an attempt to exercise rule-making authority denied to it by § 2.14 in language as clear as legislative draftsmen could conceive.[9]

In Fire Ass'n of Philadelphia v. Love, 101 Tex. 376, 108 S.W. 810 (1908), the Court said that "when the language to be construed is plain and unambiguous, as is that before us, executive construction is entitled to little consideration." See also, J. Dickson, "Attorney General Opinions," 9 Houston Law Review 495, 522 (1972). The first interpretation of the Act (*No. M–387*) was correct and it necessarily follows that the later opinion (*No. M–1029*) is clearly wrong and we so hold.

■ We turn now to a consideration of the three specific advertisements attached to plaintiff's pleadings and offered in evidence upon the venue hearing. None of the advertisements has any direct statement of *price,* per se, and defendants have not called our attention to any advertisements of plaintiff which do contain a specific reference to price. Instead, the words which apparently provoked the "interpretation" under consideration were exemplified by these samples:

A. *Exhibit 10:* "You'll discover that TSO fees for professional eye care and finest quality eyewear are most reasonable."

B. *Exhibit 11:* "TSO . . . can fill your prescription accurately and economically . . . ."

C. *Exhibit 12:* "Reasonable cost." "Convenient credit available." "Bank Americard and Master Charge cards honored."

Webster's Third New International Dictionary (1966) defines price as "the amount of money given or set as the amount to be given as a consideration for the sale of a specified thing." The American Heritage Dictionary (1969) defines price as "1. The sum of money or goods asked or given for something. 2. The cost at which something is obtained."

These dictionary definitions are in accord with those employed by the courts,

---

8. The substance of the three rules upheld in the *Kee Case* is now to be found in § 5.09(a), § 5.12, and § 4.04(a)(9) of the Act, while the rule involved in the *Carp Case* is to be found in § 5.13 of the Act.

9. Even if the statute were ambiguous, and no one contends that it is, it must be strictly construed since it is penal in nature and deprives the licensee of a valuable property right. Texas State Board of Medical Exam. v. McClellan, 307 S.W.2d 317, 320 (Tex.Civ.App., Houston, 1957, error ref. n. r. e.).

many examples of which are to be found in 72 C.J.S. Price, p. 498 (1951). See also, Taxation—General, Art. 20.01(L), (1), V. A.C.S., the Sales Tax Act, which defines "Sales Price" as "the total amount for which taxable items are sold, valued in money, whether paid in money or otherwise . . . ."

▮ In the construction of all civil statutes, "[t]he ordinary signification shall be applied to words . . . ." Art. 10, V. A.C.S. Or, as said in Engelking v. Von Wamel, 26 Tex. 469, 470 (1863), "[W]ords employed by the legislature shall be taken in their ordinary and popular acceptation."

We paraphrase the words of Justice Steakley in Railroad Commission of Texas v. Miller, 434 S.W.2d 670, 672 (Tex.1968):

"There is no basis for saying that employment of the [word "price"] in Section [5.09(a)] did not express the true intent of the Legislature, or that the use of the term resulted from inadvertence, or mistake, or artless and unskillful draftsmanship."

The holding is peculiarly appropriate to the case at bar. Indeed, as shown by our record, the Legislature knew precisely what it was doing and used "price" in its accepted meaning.

▮ Courts, and the Attorney General, in construing statutes, must take them as they find them. Texas Highway Com'n v. El Paso Bldg. & Const. Tr. Coun., 149 Tex. 457, 234 S.W.2d 857, 863 (1950); Simmons v. Arnim, 110 Tex. 309, 220 S.W. 66, 70 (1920); City of Port Arthur v. Tillman, 398 S.W.2d 750 (Tex.1965). Neither the courts nor the Attorney General may invade the legislative field. Brazos River Authority v. City of Graham, 163 Tex. 167, 354 S.W.2d 99 (1961).

▮ As indicated earlier, the trial court overruled the plea of privilege, thereby finding all necessary facts in support of the maintenance of venue in the forum county. We are required to follow the rule enunciated in James v. Drye, 159 Tex. 321, 320 S.W.2d 319, 323 (1959): "On appeal from an order overruling a plea of privilege every reasonable intendment must be resolved in favor of the trial court's judgment." In this case, such would include an implied finding that the three specified advertisements of plaintiff did not amount to an advertisement of price as set out in § 5.09(a), and that the defendants in adopting the "interpretation" in issue exceeded the authority granted to the Board in § 2.14. From these findings, with which we are in accord and which are supported by the record, it followed as a matter of law that the acts of the defendants were ultra vires, null and void—as applied to plaintiff's specific advertisements and similar advertisements—and such action did not constitute the exercise of state authority. Cobb v. Harrington, supra (190 S.W.2d at 712); W. D. Haden Company v. Dodgen, supra (308 S.W.2d at 840).

▮ This brings us to a consideration of defendants' third point of error: "The evidence fails to establish that defendants committed a trespass against the plaintiff in Jefferson County." A consideration of this contention requires us to add to an already lengthy opinion to recite additional facts. After the promulgation of the "interpretation," the defendant Burton, as Chairman of the Board, addressed a letter to all Texas optometrists, including plaintiff and those in his employ, advising them of the opinion from the Attorney General (*No. M–1029,* dated December 29, 1971) and concluding: "Please be aware that the Texas Optometry Board is bound by this opinion and that any *reference to price,* either direct or indirect, will be carefully noted."

In one instance, Dr. Bowen, Secretary of the Board, addressed a letter to one of plaintiff's licensed optometrists reading as follows:

"It has been brought to the attention of the Board that you have been running newspaper advertisements which refer to

price. The term 'reasonable fees' is in direct violation of Section 5.09 of the Texas Optometry Act.

"This letter is to inform you that we shall expect you to cease and desist this type of advertising immediately. We shall also expect from you, *by return mail,* a letter indicating that this notice from the Board has been complied with and that you intend in the future to comply with all sections of the law pertaining to your practice of optometry." (emphasis in original)

As indicated previously, we are of the opinion that the Board had no authority to determine that an advertisement of "reasonable fees" was an advertisement of price as prohibited in § 5.09.

This was a direct threat of sanctions since the Board is authorized by virtue of § 4.04(a)(10) of the Act to revoke the license to practice optometry upon a finding that "the applicant or licensee has willfully or repeatedly violated any of the provisions of this Act." The Board's "interpretation" of § 5.09, that the advertisement of "reasonable fees" by an optometrist was illegal, was a direct threat—after receipt of the letter quoted above—to revoke the license of one who did so advertise, including the plaintiff who so advertised in the county of his residence, Jefferson County.

Defendants support their argument under the third point by citing four decisions of the courts of civil appeals to the effect that a defendant "is entitled to be sued in the county of his residence in the absence of any statutory exception and that exceptions to the Plea of Privilege of a citizen to be sued in the county of his domicile must be strictly construed and clearly established." We accept the statement of the law so made and pass on to the *sole remaining authority* cited in support of the point: Sheppard v. Zapp, 120 S.W.2d 898 (Tex.Civ.App., Waco, 1938, no writ).

10. We had occasion recently to review some of the authorities on the subject of what is the dominant and primary purpose of a

This case is readily distinguishable from the case at bar since *Zapp* sought *only* injunctive relief and venue was fixed by Art. 4656, V.A.C.S., the court saying:

"This suit cannot properly be regarded as one based upon a trespass committed in Freestone county for the reason no redress is sought for the trespass. The primary and ultimate purpose of the suit as disclosed by the petition, evidence and judgment entered is to obtain an injunction . . .."

Here the primary, ultimate, and dominant purpose of plaintiff's suit was to obtain a declaratory judgment that the Board's "interpretation" was invalid and ultra vires.[10] This is abundantly clear from an examination of the pleadings, the testimony, and the judgment of the court.

The injunctive relief sought by plaintiff in this suit was purely ancillary to the primary and dominant relief he sought in his declaratory judgment action. The rule is stated clearly in 6 Texas Practice (2d Ed. 1973) § 156, p. 195:

"Ancillary injunctions may be issued in aid of causes of action other than those involving purely injunctive relief. They are distinguished from original actions for injunction in that the decree sought in the main case is independent of injunctive relief, and injunction is merely a means of effectuating the decree by preserving the subject-matter pending final decision or by effectuating the judgment rendered in the case."

See also, Houston Oil Co. of Texas v. Village Mills Co., 109 Tex. 169, 202 S.W. 725, 226 S.W. 1075 (1918); City of Dallas v. Wright, 120 Tex. 190, 36 S.W.2d 973 (1931); City of Beaumont v. West, 484 S.W.2d 789 (Tex.Civ.App., Beaumont, 1972, error ref. n. r. e.).

■ The right to practice a profession, once granted, is a valuable right and enti-

plaintiff's suit. McFarling v. Cavender, 469 S.W.2d 478, 480, fn. 3 (Tex.Civ.App., Beaumont, 1971, no writ).

tled to protection under the due process clauses of the state and federal constitutions. House of Tobacco, Inc. v. Calvert, 394 S.W.2d 654, 657 (Tex.1965), and cases therein cited. Indeed, as was said in Waller v. State, 68 S.W.2d 601, 605 (Tex.Civ. App., Amarillo, 1934, error ref.) [cited in *House of Tobacco,* supra], "The right to practice a profession has been called a property right, but it is more."

 It has long been the rule in Texas that an officer of the state who acts in accordance with the law, incurs no liability; but, if he goes further and oversteps the bounds of the authority confided by the law to wrongfully and unnecessarily oppress and injure a citizen, he commits a trespass for which a civil action will lie against him. Hilliard & Hilliard v. Wilson & Blum, 65 Tex. 286, 291 (1886). In City of Mineral Wells v. McDonald, 141 Tex. 113, 170 S.W.2d 466, 468 (1943), the Court, quoting from a text, said:

> " 'A "trespass," within the meaning of subdivision 9 of R.S. art. 1995, includes injuries to persons or property resulting from *wrongful acts,* either wilfully inflicted or the result of affirmative, active negligence upon the part of the wrongdoer, as distinguished from injuries that are the result of a mere omission of duty.' "

The adoption of the "interpretation" was, under our record, a willful act and, under our interpretation of the statute, was wrongful. The next obvious step to be taken by the defendants in the enforcement of the "interpretation" was the institution of proceedings to revoke or cancel plaintiff's license to practice optometry under the provisions of § 4.04 of the Act, with plaintiff having a right to appeal from a revocation to the district court of the county of his residence. Sec. 4.04(d). Plaintiff was not required to await the final step but properly invoked the provisions of the Declaratory Judgments Act, Art. 2524–1, V.A.C.S. 2 Anderson, Actions for Declaratory Judgments § 538, p. 1224

(1951); Cobb v. Harrington, supra (190 S.W.2d at 712). Under the undisputed record as presented by the appeal, the trial court properly overruled the plea of privilege. Sanders v. State Department of Public Welfare, supra (472 S.W.2d at 184). The judgment of the trial court is affirmed.